IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, EASTERN DIVISION

```
PATRICK JAMES GRIDER,       )
et al.,                     )
                            )
     Plaintiffs,            )
                            )        CIVIL ACTION NO.
     v.                     )        3:07cv1031-MHT
                            )           (WO)
CITY OF AUBURN,             )
et al.,                     )
                            )
     Defendants.            )
```

OPINION AND ORDER

The plaintiffs, Patrick James Grider and Daniel

Joseph Grider (as well as a company in the restaurant and

bar business, The Fourth Quarter, wholly owned by the

Griders), charge that the defendants, the City of Auburn

and several city officials and employees, improperly

enforced various laws against them in myriad ways over a

period of several years.  The Griders assert claims under

the Fourth and Fourteenth Amendments to the United States

Constitution, as enforced by 42 U.S.C. § 1983.  The

Griders also assert related claims under state tort law.

Jurisdiction is proper under 28 U.S.C. § 1331 (federal

question), 28 U.S.C. § 1343 (civil rights), and 28 U.S.C. § 1367 (supplemental).

This case is now before the court on the defendants' motion for summary judgment.  For the reasons discussed below, that motion will be granted in part and denied in part.

## I. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In deciding whether summary judgment should be granted, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## II. BACKGROUND

Patrick and Daniel Grider own and operate several bar and restaurant businesses in Auburn, Alabama. They allege a wide-ranging conspiracy targeting their businesses. They name the following as defendants: the City of Auburn, Mayor William Ham Jr., City Manager Charles M. Duggan, Jr., Public Safety Director William James, Deputy Public Safety Director Andrew Meeks, Fire Inspector Thomas Massey, and Police Officers James Terry Neal III, Jason Crook, Christopher Carver, and Slone Maddox.[1] The conspiracy, as described below, consisted of efforts to use criminal laws, building-code inspections, verbal intimidation, city ordinances, and a variety of other legal and illegal means to affect the Griders negatively and destroy the vitality of their business interests, particularly their interest in a business called The Skybar Café.

---

1. All defendants except the City of Auburn are parties in their individual capacities only.

3

In 2005, Edwin Lewis, a private developer and contractor, purchased land in Auburn with the goal of developing condominiums and retail space in the downtown area. Some of the newly purchased land included several parcels immediately surrounding Skybar. Prior to purchasing the property, Lewis had private meetings with Mayor Ham and Auburn's Economic Development Director, Phillip Dunlap. Later in 2005, the City of Auburn, at Lewis's initiation, began a partnership of sorts to advance Lewis's goals. According to then-City Manager David Watkins, high-ranking city officials insisted repeatedly that, because of the relationship with Lewis, they had to "get the Skybar out." Pl.'s Ex. P at 278, 285. After more meetings that included Ham, Dunlap, and Lewis, Dunlap asked what could be done to get rid of the Skybar and stated that, in order for the Lewis project to work, "we have to get them out." Id. at 129. Ham agreed. High-ranking city officials then considered the use of eminent domain to get rid of the Skybar, including

4

discussions about how to justify such a removal as a "public purpose"--an idea with which Watkins quickly disagreed because of the political and legal consequences of condemning a viable business in order to hand over property to another private business.  Ham and Dunlap eventually suggested that condemning the property would be significantly less costly if Skybar, as the tenant in the building and source of income, were removed.  Lewis became close with both Ham and Dunlap and, in 2006, Lewis purchased the remainder of the property immediately surrounding the Skybar.  Dunlap, Lewis, and Duggan (who was appointed Assistant City Manager at Ham's suggestion and became City Manager after Watkins) then attempted to convince the owner of the property that Skybar rented to exchange the property for a nearby parcel.  The owner refused, and the eminent-domain approach was apparently not pursued at the time.

City officials and employees instead opted for a different approach.  The Griders argue that the city

began enforcing its laws in a discriminatory manner in an effort to harass them and put them out of business. These efforts included placing their businesses under special surveillance, improperly calculating occupancy numbers pursuant to building-safety codes, issuing improper criminal citations and charges, and passing specifically targeted city legislation concerning alcohol sales.

Police conducted video surveillance a number of times on Skybar, a practice that was unprecedented for any other establishments in Auburn and which was not contemporaneously undertaken for any other business. Moreover, while officers wrote "Incident/Offense Reports" for liquor law violations, the videos associated with those reports do not show any violations. The majority of the tapes created during that surveillance have not been produced to the Griders and are, apparently, unavailable.

6

Several police officers were engaging in one such instance of video surveillance in the early morning hours of September 29, 2005. While other officers videotaped, Officers Crook and Carver made their way to the rear entrance of Skybar. Upon hearing that the officers were peeking through the back door, Patrick Grider exited the bar and went around to find out what was happening. The officers told Grider that the back door was open and that they were "checking things out." Pl.'s Ex. A at 5. After a brief conversation with officers, Grider reentered the bar.

Later in the morning, Officer Neal entered Skybar and said to Grider, "We got you." Grider asked what Neal was talking about, and Neal responded, "I told you that we would get your license." Grider again asked Neal to explain, and Neal replied, "You will find out." Id. at 6.

The next day, Grider was asked to go to the Auburn Police Department. Grider was told that he was being

7

charged with attempting to bribe a police officer. Grider then signed a statement, written by a detective, denying the allegations, and he was arrested.

Grider had a preliminary hearing on the bribery charge on November 29, 2005. At the conclusion of the hearing, the judge dismissed the case for lack of probable cause.

The Griders have also produced a sworn statement from a city resident detailing Officer Neal's attempts to get her to cooperate with an investigation into the Griders. Neal told her that he had been trying to shut the Griders down for four years, and he threatened her with arrest for underage drinking if she did not cooperate in implicating Patrick Grider in serving alcohol to minors. She claimed that Grider did not serve her any alcohol.

Even though officers, under the direction of Police Officer Maddox, had compiled at least ten Incident/Offense Reports throughout the course of this surveillance operation, the surveillance was terminated

8

at the direction of Lieutenant Keith Howell shortly after the bribery charge against Patrick Grider was dismissed, and the investigation into the alleged violations was not pursued.

The Griders and their employees were subsequently cited repeatedly for overcrowding violations.  Neither the Griders nor any of their employees were ever convicted of an overcrowding offense.  Orders to patrol bars for overcrowding often came from very high levels within the city government, particularly from Duggan, who as Assistant City Manager, directed employees to conduct occupancy checks without the knowledge or permission of his supervisor, Watkins.  On October 14, 2006, for example, Patrick Grider was issued an overcrowding citation by Fire Inspector Massey.  Grider was found guilty of the offense by a municipal judge and sentenced to a six-month suspended sentence.  Grider stated to the judge his intention to appeal, and the judge then immediately sentenced Grider to six months in jail

instead.   When Grider appealed to circuit court, the charge was nolle prosequied.

The court case involving the overcrowding citation represents the culmination of a lengthy dispute between the Griders and several city employees concerning the occupancy calculations at their establishments, particularly Skybar.   The Griders maintain that the initial occupancy calculations for Skybar were arbitrarily low and that, despite renovations increasing the size of the building, the occupancy numbers given to Skybar upon its opening in 2005 were the same as the calculations from 1998.   The city also, for the first time in the building's history, divided the occupancy number into a front and rear portion and required that a fire-alarm system be installed.   Fire Inspector Massey and Deputy Public Safety Director Meeks then informed the Griders that the occupancy number could not be increased until a sprinkler system was installed and that the Skybar would be closed if such a system was not installed

10

by the end of 2005.  The Griders argue that these
requirements were improper based on local building-safety
codes because the renovations they had made did not
trigger the requirements for new buildings.  Finally,
after the installation of the sprinkler system, Meeks
used square-footage calculations that differed from those
applied to other similar buildings to determine occupancy
and arbitrarily decreased capacity levels based on
purported problems with egress and limitations of the
fire system that had been unnecessarily installed in the
first place.

In addition to discriminatory building-code
enforcement, the Griders contend that they were the
target of a series of discriminatory actions by the city
council based on legislation proposed and supported
chiefly by Mayor Ham and now-City Manager Duggan.  The
Griders argue that a resolution in 2001 and ordinances in
2001, 2007, and 2008 sought to single them out for
harsher treatment and indicate a consistent plan to

modify liquor laws in ways that harmed their businesses, including changing the requirements of various licenses shortly after the Griders obtained those licenses.

It would be unmanageable to reproduce here all of the details and evidence uncovered throughout discovery and placed into the record.  Accordingly, additional detail, to the extent it is included, will be discussed when relevant to specific claims.

### III. DISCUSSION

### A. § 1983 Claims

### 1. Substantive Claims

The Griders assert a false-arrest claim against Fire Inspector Massey for his October 2006 citation; malicious-prosecution claims against Massey for the October 2006 citation as well as citations in November 2005; a malicious-prosecution claim against Police Officer Carver for the fall 2005 bribery charge; equal-protection claims against Mayor Ham and City Manager

Duggan for proposing certain legislation; an equal-protection claim against Meeks for improperly enforcing the city's building codes; and due-process and equal-protection claims against the city based, essentially, on its alleged policy and custom to sanction the above violations. The Griders also assert a conspiracy among all named defendants to commit these federal torts, and they ask the court to declare several city enactments unconstitutional.[2]

---

2.    The Griders asserted several other claims, but those claims are time-barred. The Griders filed this suit on November 21, 2007. The statute of limitations for the § 1983 claims is two years. See Owens v. Okure, 488 U.S. 235 (1989) (holding that § 1983 claims look to the general state law limitations statute for personal injury actions); 1975 Ala. Code § 6-2-38(l) (establishing general personal injury limitations period of two years). While state law determines the applicable limitations period, federal law determines when a claim accrues, thus commencing the applicable state limitations period. Wallace v. Kato, 549 U.S. 384, 388 (2007). The Griders concede that their false-arrest claims against Massey arising from his November 2005 citations and the false-arrest claim against Carver, accruing on September 30, 2005, are barred. See Kato, 549 U.S. at 388-89 (holding that false-arrest claims generally accrue at the time of the false arrest or, more precisely, at the time when the false arrest or imprisonment ends). Likewise, the
(continued...)

13

### a. False-Arrest Claim Against Massey

Fire Inspector Massey argues that he cannot be liable because the citation he issued on October 14, 2006, does not constitute an arrest and because, even if it does, he is entitled to qualified immunity given that he had arguable probable cause to issue the citation.

The citation for overcrowding issued by Massey required Patrick Grider to appear in Auburn Municipal Court to answer a misdemeanor charge. The mere issuance of a citation is typically treated as qualitatively different from a physical seizure or arrest, in which

---

2.  (...continued)
Griders do not dispute that claims against Ham, Duggan, and Meeks accruing before November 21, 2005 have expired.

Any other claims arguably implicated by the lengthy complaint were not argued in the Griders' response in opposition to summary judgment. Accordingly, they are considered waived. See Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp., 182 F.3d 888, 892 (11th Cir. 1999) (affirming the "unremarkable proposition that assertions made in the pleadings[,] ... but not made in opposition to a motion for summary judgment, need not be considered by the district court ... in ruling on the motion for summary judgment"). This includes any possible claims of conspiracy based on state law.

14

courts usually require the subject to feel that she is not free to leave.  See Bielanski v. County of Kane, 550 F.3d 632 (7th Cir. 2008) ("No court has held that a summons alone constitutes a seizure, and we conclude that a summons alone does not equal a seizure for Fourth Amendment purposes."); see also Martinez v. Carr, 479 F.3d 1292 (10th Cir. 2007) (holding that a misdemeanor citation cannot support a claim for unlawful arrest).

Although it can surely be argued that Grider was not free to refuse the citation and, further, that the citation would inevitably lead to a future seizure, the mere issuance of an order to appear at a later date to stand trial is not the kind of immediate physical harm that has been held, rightly or wrongly, to constitute an illegal arrest.  To be sure, there should be a constitutional remedy for the intentional issuance of citations charging misdemeanor crimes without probable cause, even if no physical seizure typically associated

15

with arrests occurs <u>contemporaneously</u>.[3]  At least when a malicious-prosecution claim is available under § 1983, however, such a claim is the proper vehicle to attack such an illegal citation when it involves only the potential of <u>future</u> physical seizures.

Because, under current law, there was no seizure, summary judgment will be entered against Patrick Grider on his false-arrest claim against Massey.

<u>b. Malicious-Prosecution Claims Against Massey</u>

<u>i. October 2006 Citation</u>

Officers who demonstrate that they acted within their discretionary authority are entitled to qualified immunity unless their actions violated clearly established constitutional rights.  <u>Cottone v. Jenne</u>, 326

_____

3.  The court does not reach the question of whether, even if no physical seizure occures, the Patrick Grider could have other remedies available to him--such as equal-protection or due-process claims--for the intentional issuance of citations that charge misdemeanor offenses without probable cause.  The contours of such claims will not be examined here because Grider has not attempted to make any arguments implicating them.

16

F.3d 1352, 1358 (11th Cir. 2003).  Patrick Grider argues
that Fire Inspector Massey could not possibly have been
acting within the scope of his discretionary authority
because Auburn simply did not, at that time, have any
criminal sanctions for overcrowding.  Grider is correct
that the combination of multiple local ordinances and
fire-code sections purportedly addressing this issue is
confusing, and it is not easy to determine if Auburn had
appropriately enacted criminal penalties for such
violations.

As the Eleventh Circuit Court of Appeals explained in
Holloman v. Harland, 370 F.3d 1252, 1265-66 (11th Cir.
2004), however, the concept of discretionary authority,
at least in the realm of federal qualified immunity, asks
only whether the conduct is the type that fell within the
employee's job responsibilities.  Here, Massey's duties
clearly included ensuring compliance with local fire
codes and notifying businesses of potential sanctions and
hearings related to their noncompliance.  Local laws at

17

least arguably gave him authority to issue citations for violations (an issue addressed in more detail below), and indeed, such conduct was standard among Massey and other Auburn fire inspectors.  Massey's belief that this behavior was part of his job was reasonable.  While it is a potentially complicated question whether, generally, a city employee can have qualified immunity for issuing charges that do not exist, in this case the complicated and confusing interaction among various city codes and ordinances was subject to reasonably differing constructions such that it was entirely reasonable for Massey to believe that he had authority to issue citations for overcrowding.

Thus, because Massey was acting within the scope of his employment duties, Grider must demonstrate that Massey's conduct violated his clearly established right to be free from malicious prosecution.

To establish a constitutional claim for malicious prosecution, Grider must show the elements of the common-

18

law tort of malicious prosecution, as well as a violation of their Fourth Amendment rights.  See Wood v. Kesler, 323 F.3d 872, 881 (11th Cir. 2003).  Even though the parties have not addressed the issue, a malicious-prosecution claim thus requires a Fourth Amendment seizure; indeed, malicious prosecution is a claim cognizable under the Fourth Amendment precisely because of the deprivations of liberty that typically accompany criminal proceedings.

In the case of the October 14, 2006, citation, Patrick Grider was clearly seized within the meaning of the Fourth Amendment.  The city judge convicted him of the offense and sentenced him to a six-month suspended sentence.  After Grider's attorney notified the judge that he would be appealing the sentence to the state court and that, as a result, he did not want his client to sign a document concerning the sentence as read by the judge, the city judge changed his mind, asked for the sheet of paper back, ordered that Grider "be incarcerated

19

in the county jail for six months," ordered that Grider have a seat in the courtroom, and set a standard bond for appeal. Ex. BBB at 27-28.

Having demonstrated a Fourth Amendment seizure, Grider must still satisfy the elements of malicious prosecution under Alabama law: (1) institution of a judicial proceeding by the defendant, (2) lack of probable cause, (3) malice by the defendant, (4) termination of the proceeding in favor of the plaintiff, and (5) damages. <u>Allen v. Molton, Allen & Williams Realty Co.</u>, 495 So.2d 27, 30 (Ala. 1986). It is not disputed here that Massey instituted criminal proceedings against Patrick Grider; that the proceedings were terminated in Grider's favor, <u>see</u> <u>Uboh v. Reno</u>, 141 F.3d 1000, 1005 (11th Cir. 1998) (noting that an entry of a <u>nolle prosequi</u>, as occurred in Grider's case, is viewed as a favorable termination); and that Grider suffered damages, including being forced to appear in court and hire a lawyer to defend himself. Massey disputes,

however, whether Grider has shown malice and lack of probable cause.

Massey argues that he had probable cause to issue the citation and that, therefore, he is entitled to qualified immunity on the malicious-prosecution claim.  The Griders have put forward significant evidence, discussed below, that another employee arbitrarily and improperly calculated the occupancy numbers and fraudulently required them to make a number of modifications purportedly affecting occupancy calculations.  This evidence, about which there is a genuine dispute, creates a real issue concerning whether the Griders were in violation of applicable fire codes.  In other words, code inspectors cannot illegally calculate occupancy numbers and then claim that they had probable cause to charge Patrick Grider with a misdemeanor offense when Skybar exceeded the number of patrons allowed by that artificial, arbitrary, and improper calculation.

However, the evidence does not establish that Massey was involved at all in (or even aware of) the allegedly improper calculations.   Indeed, the evidence merely establishes that Massey, as part of his duties as an inspector, counted the patrons at Skybar and applied the previously calculated assigned occupancy numbers to issue a citation.  Without any evidence of Massey's involvement in the improper calculations, Grider cannot show that Massey was not reasonably performing his job duties by issuing citations, and, moreover, Grider cannot show that a constitutional right was violated by the October 14, 2006, citation.

Grider nonetheless argues that Massey had no probable cause because the bar was not overcrowded and because the offense which Massey charged did not exist under existing city law.  First, the only evidence referenced by Grider to establish that the Skybar was not overcrowded on October 14, 2006, is a general denial in Patrick Grider's affidavit that any of his bars was ever overcrowded at

any time during his operation of the businesses; this denial is based, in part, on information and belief. However, "statements in affidavits that are based, in part, upon information and belief, cannot raise genuine issues of fact, and thus cannot defeat a motion for summary judgment." Ellis v. England, 432 F.3d 1321, 1326 (11th Cir. 2005).  Second, as the court discusses later, the city had established a criminal offense for violations of the building code (such as overcrowding) and, even if it had not, Massey's determination that he had the authority to issue citations for that offense was certainly reasonable given the complex interaction of city ordinances and building codes.  Summary judgment will be entered against Patrick Grider on his malicious-prosecution claim against Massey based on the October 2006 citation.

## ii. November 2005 Citations

Grider asserts, almost in passing, malicious-prosecution claims for citations issued by Fire Inspector Massey on November 18 and 19, 2005. However, while Grider has shown that those charges were <u>nolle prosecuied</u> within the two-year limitations period for § 1983, <u>see</u> <u>Owens v. Okure</u>, 488 U.S. 235 (1989) (holding that § 1983 claims look to the general state-law limitations statute for personal-injury actions); 1975 Ala. Code § 6-2-38(l) (establishing general personal-injury limitations period of two years), he has not provided any other detail about the incidents. For example, unlike with respect to the October 2006 citation, he has not even shown that there was an eventual seizure as a result of the citation. <u>See</u> <u>Kingsland v. City of Miami</u>, 382 F.3d 1220, 1236 (11th Cir. 2004) (suggesting that the mere fact of a summons would be insufficient to constitute a seizure for malicious-prosecution purposes). Because Grider has not offered the detail that would allow the court to

24

determine if he has met the elements of a malicious-prosecution claim with respect to Massey's November 2005 citations, his Fourth Amendment claim for malicious prosecution based on those citations fails.

### c. Malicious-Prosecution Claim Against Carver

With respect to Officer Carver's prosecution of Patrick Grider for bribery, Grider was clearly arrested for Fourth Amendment malicious-prosecution purposes; an arrest made pursuant to a warrant constitutes a seizure pursuant to legal process for the purposes of a malicious-prosecution claim because "an arrest warrant is one of the initial steps of a criminal prosecution." Whiting v. Taylor, 85 F.3d 581, 585 (11th Cir. 1996). The parties do not dispute that Carver was acting within his discretionary authority when he arrested Grider and instituted criminal proceedings against him; that the proceedings were terminated in Grider's favor when the judge dismissed the charge for lack of probable cause;

and that Grider suffered injury by being forced to defend himself.

Carver argues instead that Grider cannot demonstrate the lack of probable cause or malice necessary to prove a claim of malicious prosecution. Carver argues that he properly applied for and obtained an arrest warrant because he had probable cause "to sign a warrant against Patrick for attempting to corruptly influence the investigation in violation of the bribery statute." Defs.' Brief at 35.

The question of malice is an inference of fact, to be determined by the jury, and the presence of malice "can be inferred from an absence of probable cause." Willis v. Parker, 814 So.2d 857, 864 (Ala. 2001). When the evidence is in dispute, both probable cause and malice are questions of fact for the jury. Kingsland v. City of Miami, 382 F.3d 1220, 1235 (11th Cir. 2004).

It is clear that the evidence in this case about the existence of probable cause for Carver's arrest is in

serious dispute.   Grider denies the fundamental facts underlying the bribery charge, particularly that he offered any money to Carver.   If true, Grider's assertions support his claim that Carver simply fabricated the bribery charges as part of an ongoing attempt to harm the Griders' business.   Moreover, the evidence presented before the judge at the preliminary hearing had serious holes that call into question the decision to arrest Grider and pursue bribery charges against him.   Grider has supported his own testimony on this matter--itself sufficient to create a genuine dispute--with evidence concerning the suspicious timing of surveillance videos and the crucial points at which police apparently stopped filming; the decision not to conduct fingerprint tests on the money Grider allegedly offered; and the testimony at Grider's preliminary hearing at which several officers testified and after which the judge dismissed the charges.

27

For example, Officers Carver and Crook testified at the hearing that they did not see any alcohol served after 2:00 a.m and had no evidence or information that suggested alcohol was being served.  In spite of this testimony, Carver now maintains in his affidavit in this litigation that, prior to the attempted bribery, he told Grider that he could not overlook the fact that Skybar was serving alcohol past 2:00 a.m on a Sunday.  Grider correctly points out, in addition, that September 29, 2005 was a Thursday and not a Sunday.

Carver also maintains that Grider placed three $ 50 bills on the sidewalk and offered the money to officers if they looked the other way concerning any potential liquor violation.  As noted above, the bills themselves were never tested for fingerprints, and Grider denies ever offering to bribe an officer or leaving any money; indeed, the officers themselves testified at the hearing that they did not observe any liquor violations (the avoidance of which was the purported motive of the

bribery).   Moreover, while officers were conducting video surveillance at the time of the incident, the videotape inexplicably cuts off immediately before the alleged act of bribery took place.   At the preliminary hearing, Officer Neal claimed that he had videotaped Grider returning to the bar after speaking with Carver, but he could not explain why the tape cut off shortly after Grider first exited the bar to speak with officers.[4]

Because a jury could find that no probable cause existed and could infer malice from the circumstances, summary judgment will be denied on Patrick Grider's malicious-prosecution claim against Carver.[5]

--------

4.   Neal also claimed that he did not turn off the video until he received a call from a supervising officer, Officer Maddox, telling him to "wrap up" the investigation.   However, prior to cutting off, the video does not indicate a call from Maddox.

5.   Carver also argues that, even if there was no probable cause for a bribery arrest, there was probable cause for a "closely related" offense: obstruction of governmental operations.   Carver simply ignores, however, that viewing the evidence in the light most favorable to Grider--which would mean disbelieving all of the facts put forward by Carver because they are contradicted by (continued...)

### d. Due-Process and Equal-Protection Claims Against Ham, Duggan, Meeks, and the City of Auburn

The Griders' due-process and equal-protection claims can be divided into two general categories.  First, the Griders make a variety of claims concerning city ordinances that supposedly targeted their businesses. Second, the Griders allege discriminatory safety code enforcement by city officials.

### i. Claims Against Ham and Duggan

The Griders first bring an equal-protection claim against Mayor Ham for a 2001 resolution that allegedly explicitly targeted one of their businesses, The Blue Room.  As previously noted, the statute of limitations on each of the Griders' claims under § 1983 is two years. The Griders contend, however, that this claim, based on

_____

5.  (...continued)
Grider's account, including that Grider ever offered him money--Carver's fabricated story could not support probable cause for any offense.

30

the 2001 resolution, did not accrue until, at the
earliest, November 29, 2005.  This date presumably refers
to the preliminary hearing on Patrick Grider's bribery
charge at which Officer Neal testified that he wanted to
put the Skybar out of business because of all the
complaints and violations about which he had heard.
However, the Griders do not explain what about Neal's
comment alerted them to the discriminatory nature of a
resolution, passed four years earlier, that explicitly
targeted a different one of their businesses.  Nothing
about Neal's comment relates to the resolution, and the
comment simply exhibits the feelings of one officer based
on his recent history of dealings with Skybar.  Moreover,
the Griders argue that the 2001 resolution targeted their
business de jure, and it is unclear why, if that were the
case, they would need to wait until evidence of a larger
conspiracy was uncovered (assuming that Neal's statement
even qualified as such evidence) in order to sue about a
resolution that, allegedly, already improperly

31

discriminated against them on its face.  Moreover, as discussed in more detail below, even if the claim survived the statute of limitations--which it does not--the Griders have not demonstrated that the resolution violated their constitutional rights.

The Griders also assert equal-protection claims against Mayor Ham and City Manager Duggan based on city ordinances from 2001, 2007, and 2008.  Ham and Duggan argue that they are entitled to absolute immunity for their roles in drafting, proposing, and voting on those ordinances.

Absolute legislative immunity extends to purely local legislators.  Brown v. Crawford County, 960 F.2d 1002, 1011-12 (11th Cir.1992).  However, this immunity applies only to actions that are inherently legislative (policy-making) as opposed to administrative (policy-applying).  Corn v. City of Lauderdale Lakes, 997 F.2d 1369 (11th Cir. 1993).  Thus, applications of general city policy to a specific party, even if undertaken by city officials

32

who would be immune from suit for the <u>creation</u> of that policy, are not protected by legislative immunity.   <u>See</u> <u>Crymes v. DeKalb County</u>, 923 F.2d 1482, 1486 (11th Cir.1991).[6]

The Griders argue that, because the actions of Ham and Duggan in drafting and introducing ordinances were directed specifically at them, Ham and Duggan are not entitled to immunity because such legislation hardly should be seen as laws of general application.  However, this argument, while indeed reasonable, misunderstands the rule as outlined by the Supreme Court and Eleventh Circuit.  It is the type of action undertaken, not merely the identity of those affected or the motives behind the conduct, which is dispositive.   <u>Bogan v. Scott-Harris</u>, 523 U.S. 44, 54 (1998).   Drafting, introducing, and

---

6. Although Duggan was the City Manager and, thus, not a formal voting member of the city council, it is clear that executive officials are entitled to absolute legislative immunity when they perform legislative functions.   <u>Bogan v. Scott-Harris</u>, 523 U.S. 44, 55 (1998).  Here, the Griders include Duggan because of his purported role in drafting the ordinances at issue.

33

voting for the city ordinances were clearly legislative actions, see Hudgins v. City of Ashburn, 890 F.2d 396, 406 n. 20 (11th Cir. 1989), even if those ordinances were motivated by the intent negatively to impact specific individuals.     Even    if    the    ordinances    were unconstitutional based on that purpose, those acting in a legislative capacity by proposing and enacting them cannot be held liable under current law.   Introducing ordinances regarding alcohol licensing is different from taking action against particular businesses based on those regulations--such as a hearing before the city council concerning whether to grant a particular liquor license.   The latter, like decisions to deny building permits or the approval of specific site plans, would be an application of policy to a specific person and would not be subject to absolute immunity.   Corn, 997 F.2d at 1392.

Of course, this reasoning has its limits.  Otherwise, legislators could turn every policy application intended

to have discriminatory individual effects into an ordinance of ostensibly general application (even though only one party is targeted and meets the particular criterion upon which facial generality is based), thereby escaping liability.   At some point, continued 'legislating' of actions typically done through administrative means might suggest a conscious attempt to invoke absolute immunity for conduct that should not warrant that comprehensive protection.   This highlights the seemingly intractable problem of creating a clear separation between legislative and administrative acts, a problem into which the court need not wade in this case.   It also highlights the importance of a functional, flexible, and contextual analysis to determine if the action is more administrative or legislative in nature. In smaller towns, moreover, the line between the administrative and legislative blurs even further because of the small number of affected parties to any particular

35

legislative action, thus making a careful contextual examination all the more critical.

Here though, where facially neutral alcohol-licensing laws are passed, the fact that some provisions were intended to target specific businesses does not fully paint the legislation with the brush of administrative action. See Brown, 960 F.2d at 1012 (noting that even in the case of a conspiracy, "an unworthy purpose does not preclude absolute immunity to legislators acting in their legislative capacity"). Importantly here, the ordinances had prospective application to any potential future license holders, not just the Griders, see Bogan, 523 U.S. at 56, even if the Griders are correct in their vague contention that they were the party most affected by the changes at the time they were enacted. The procedures followed in proposing and voting on the ordinances were those of a legislative action; the liquor ordinances were the kind of policy typically achieved through legislative action; and the Griders have simply

36

not presented sufficient evidence of a complete sham of the legislative process that might raise questions about allowing absolute immunity for local legislators.

As a result, Ham and Duggan have absolute immunity, and summary judgment will be entered against the Griders on their equal-protection claims against Ham and Duggan.

### ii. Claim Against Meeks

The Griders also assert an equal-protection claim against Deputy Public Safety Director Meeks for improperly calculating occupancy numbers pursuant to building-safety codes.[7]   Both parties agree that this

---

7. Meeks mentions that any claims against him "that occurred before November 21 2005 should be dismissed as a matter of law" because of the two-year statute of limitations. Defs.' Brief (doc. no. 95) at 27.  Meeks does not make any further argument, however, about which claims this would implicate.  Moreover, Meeks was continuously engaged in calculating occupancy numbers for Skybar throughout 2005 and 2006, and overcrowding citations received by the Griders were based on Meeks's 2006 calculations.  Because Meeks does not point to any evidence in the record that particular calculations were finalized outside any specific limitations period or marshal any such evidence in a way that suggests a

(continued...)

claim is properly considered a "class of one" claim, as identified in <u>Village of Willowbrook v. Olech</u>, 528 U.S. 562, 564 (2000).

A "class of one" claim requires plaintiffs to show that they have been intentionally treated differently from others who are similarly situated and that there is no rational basis for that difference. <u>Campbell v. Rainbow City</u>, 434 F.3d 1306, 1314 (11th Cir. 2006). This "similarly situated" standard is similar to the standard as applied in other contexts, such as employment discrimination. <u>See</u> <u>Griffin Indus. v. Irvin</u>, 496 F.3d 1189, 1204-05 (11th Cir. 2007). The Eleventh Circuit has emphasized that plaintiffs are required to show that they and the others to whom they point as similarly situated were "prima facie identical in all relevant respects."

_____

7.  (...continued)
particular claim against him is no longer viable, claims against Meeks for those calculations are not barred. <u>See</u> <u>Jones v. Sheehan, Young & Culp, P.C.</u>, 82 F.3d 1334, 1338 (5th Cir. 1996) ("Rule 56 ... does not impose upon the district court a duty to survey the entire record in search of evidence to support a non-movant's opposition.").

Campbell, 434 F.3d at 1314.   The crucial word in this formulation is "relevant."   The word captures only differences that would be relevant to an objectively reasonable decisionmaker.   Griffin 496 F.3d at 1204. Thus, as a practical matter, once a plaintiff alleges and demonstrates similarity and the defendants claim to point to a difference neglected by the plaintiff, it is critical that the asserted difference be relevant to the way in which the various people were treated differently.

For example, while the Griders mention that their building and the two examples of similarly situated buildings were all fairly large, Meeks argues that the other buildings were smaller.   Meeks does not, however, point out why that is relevant or cite to any provisions in the code that would indicate how that difference in size is relevant to this kind of decisionmaking.   Perhaps the other comparator restaurants are painted a different color, but without any suggestion of why color would be important to decisions about occupancy calculations under

39

building-safety codes, Meeks cannot rely on that trait to dispose of the Griders' claim.

Indeed, this case involves uniform codes that the city says it adopted and purports to enforce. The Griders have provided evidence of troubling inconsistencies and irrationalities in how these standard codes were applied to them. The existence of these standard procedures, as well as the assertion by Meeks that he applied these procedures equally and neutrally across the city, suggests that, to the extent the Griders have shown that the codes were not properly complied with, they have shown unequal treatment.

The parties do not actually dispute intentionally different treatment in important respects. The Griders maintain that the differences were irrational and motivated by the ongoing conspiracy to affect adversely their business. Meeks contends, instead, that the Griders were not similarly situated in relevant respects and that, therefore, the uniform procedures and

interpretations of those procedures rationally dictated different treatment. The parties make a variety of arguments and argue extensively about the facts relevant to this claim. It is sufficient here, however, to highlight only a few of the major inconsistencies.

As a preliminary matter, it should be noted that a building-occupancy-code determination is not the kind of multi-dimensional decisionmaking process, identified in Griffin, for which it is especially difficult to make out a "class of one" claim. While determining proper occupancy numbers certainly involves multiple informational inputs, it is still, ultimately, similar to the examples given in Griffin, which included analyzing the "topography, location, access, development, mineral content, and forestation" of a parcel of land to determine its tax treatment, as well as calculating the market value of a bridge using a variety engineering data and traffic patterns. Griffin, 496 F.3d at 1203. These examples, like the determination of the maximum occupancy

number of a building, ultimately "involved a single answer to a single question." Id. The examples were also, in the end, different from the facts of Griffin, which involved "varied decisionmaking criteria applied in a series of discretionary decisions made over an extended period of time" and concerned a chicken-processing company complaining about myriad ways in which state and local regulators enforced a variety of environmental regulations. Thus, it was particularly difficult for the plaintiff to show that it was being regulated in a discriminatory way given the constellation of regulations to which similar businesses were subjected and the relationship among various types of regulation within an overall regulatory scheme.

Even were the determination found to be more complicated here, it is quite telling that Meeks ignores and has no explanation for crucial inconsistencies in the methodology of his calculations; that is, even without delving into the minutia of the calculations (as the

Griders have done), it is possible to see some basic flaws that at least raise troubling questions about potential arbitrariness and discrimination in the calculations.

First, Meeks contends that the other establishments identified by the Griders were properly determined to merit different treatment under the codes.  Meeks argues that the other establishments (called "In Italy" and "1716" and for which different square-footage-per-person calculations were allegedly used) were not as large as Skybar.  The Griders noted that each establishment had occupancy numbers over 300 and that each had the same code-classification category as Skybar.  While Meeks suggests that overall size is relevant to the occupancy determination, he does not indicate why or how.  It is obvious that the overall size of a structure would impact the total occupancy-number calculation--as admitted by the Griders and argued by Meeks--but it is not clear how that size is relevant at all to the myriad ways in which

the Griders allege that Meeks made improper calculations, such as by altering the formula to use a higher square-footage-per-person calculation.   Indeed, it is not necessary for the Griders to show a comparator building that received the same occupancy calculation based on identical variable inputs, but rather that buildings for which the same <u>procedures</u> should have been applied somehow received different methodological treatment.   In other words, there is no evidence or argument from Meeks that the overall size of the structures is relevant at all to the content of the allegedly discriminatory decision (here, the decision to apply different methods of calculation), and it is therefore impossible for the court to conclude as a matter of law that such a difference was a legitimate reason for the ultimately different treatment.

Moreover, Meeks argues that the Griders ignore crucial differences in exit capacities among the three structures.   Meeks contends that the Griders had

**44**

substandard exits which limited total capacity.  However,
Meeks does not respond to the Griders' argument that
these very claims regarding the exits were arbitrary and
improperly calculated.  Meeks does not address the
alternate calculations offered by the Griders based on
the codes' mandated egress formula as determined by the
specific characteristics of the exits at Skybar.
Moreover, Meeks testified in his deposition to using a
different version of the International Fire Code (IFC)
from the version referenced in his affidavit.
Furthermore, even though Meeks at times argues that he
applied an earlier version of the code, the later version
of the code was the only version referenced on the
citations received by the Griders.  The Griders note that
the codes have crucial material differences, and Meeks
does not acknowledge the inconsistency let alone offer
any real justification for choosing selectively which

**45**

code to apply at different times and to different calculations.[8]

Finally, Meeks argues that the Griders' fire-alarm system had a maximum capacity of 1,000 people, and thus the final-occupancy calculation could not exceed that number. However, Meeks ignores the Griders' argument that the decision to require them to install a fire-alarm and sprinkler system was itself arbitrary and improper because it was not justified by any provision of the safety codes that Meeks--albeit perhaps inconsistently-- purported to apply and that, moreover, the 1,000 figure could be applied only to the front portion of the bar because that was the only portion arguably renovated and, thus, the only portion to which a new code provision could apply. Meeks also ignores the Griders' arguments that the calculations were improperly made even prior to the eventual increase to the purported maximum allowed by

_____

8. The Griders demonstrate that Meeks's application of different codes to different calculations resulted in his consistent use of the code that would result in the lowest occupancy calculation.

46

the fire-alarm system.  Without properly addressing any of these arguments, Meeks cannot argue that the Griders were not similarly situated to the comparators that they offered.  Indeed, based on the information provided by the Griders, none of these putative differences-- themselves contradicted by the evidence provided by the Griders--can explain away the ways in which the Griders were treated differently.

Instead of challenging the calculations made by the Griders--calculations which provide significant evidence of discrimination and arbitrariness--Meeks asks the court to strike all of the calculations because neither Patrick Grider nor his counsel is qualified as an expert for the purpose of such calculations.[9]  Meeks argues that "it is undeniably true that the interpretation of a building code is a type of specialized knowledge that is not within a lay person's understanding." Defs.' Reply (Doc.

---

9. Such action would not, as intimated earlier, cure basic inconsistencies among the various codes purportedly applied by the defendants.

116) at 54.  These calculations, however, appear to be nothing more than simple calculations based on regulations, the kind of thing for which no expert is needed and, for example, of the sort that most people do when they file their taxes.  Indeed, it is extremely simple math.  As for the interpretation of the code that is connected with the rudimentary calculations, this task is no different than the logical reasoning and textual interpretation common in the legal field.[10]

The second component of a "class of one" claim is a showing that there is no rational basis for the difference in treatment.[11]  Meeks argues that it was

_____

10.  The parties have placed the various safety codes in evidence.  Meeks apparently stands by his calculations, and thus, a decision concerning the Griders' claims involves, in part, an inquiry into the reasonableness of the Meeks's conduct (the code calculations).  To the extent the Griders and their counsel provided basic math or opinions on how code provisions fit together, the court is not bound by them but finds them instructive in its own examination and analysis.

11.  The distinction between the two parts of this inquiry may not be conceptually clear.  If two people are
(continued...)

rational for him to have had genuine concerns about the
safety of the exits and, thus, to use his discretion to
limit the occupancy of the Skybar.[12]  However, Meeks does
not address the Griders' arguments that these concerns
were essentially pretextual and were themselves based on
Meeks's improper calculations of the egress capacity, and
he does not challenge the Griders' egress calculations.
Moreover, Meeks has not produced and explained any of the
calculations used for Skybar.   In addition, a letter

------------

        11.  (...continued)
intentionally treated differently even though they are
the same in all <u>relevant</u> respects, it may be difficult to
find a rational reason for the different treatment.  That
is, any reason offered might just as easily be offered to
demonstrate why the two were not, in fact, actually in
the same position.  Perhaps the two-part test is instead
meant to function as a sort of burden-shifting process.

        12.  While it may be true that calculating occupancy
numbers is a discretionary decision in some sense, and
that the decision involves many variables, the fact that
a decision is discretionary does not mean that it can be
arbitrary, and it does not mean that the reasons offered
for the decision can be totally inconsistent.  Simply
put, even if the decision were discretionary in important
ways, it could still have been improperly and
intentionally manipulated in a way that denies equal
treatment.

49

provided by Meeks to the Griders suggests that he applied the seven person-per-square-foot calculation instead of the five person-per-square-foot calculation because the lower number had been deemed unsafe and the city planned to adopt the higher number the following September. However, the evidence suggests that Meeks and other inspectors allowed the other similar establishments to maintain the lower number. There may be rational reasons to employ a more strict person-per-square-foot requirement (just as there are certainly rational reasons to adopt a uniform fire code for a municipality) but that does not mean there is a rational reason to apply such a standard only to select buildings.

Finally, Meeks argues that he is entitled to qualified immunity because he did not violate any clearly established constitutional right by "calculating occupancy codes more stringently than other similarly situated businesses." Defs.' Reply (doc. no. 116) at 48. This argument has little merit.    It was clearly

50

established that a person has a right to be free from "intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." Olech, 528 U.S. at 564.  Olech involved the requirement of a lengthier easement than that applied to other property owners; this case involves requiring different occupancy rules to be applied to different building operators. Meeks clearly had notice that it is unconstitutional intentionally to apply the laws of the City of Auburn differently to similar citizens.  Cf. Hope v. Pelzer, 536 U.S. 730, 739-41 (2002) (holding that "officials can still be on notice that their conduct violates established law even in novel factual circumstances").

The Griders have met the requirements of a "class of one" claim, and they have therefore stated a claim for an equal-protection violation.  Just as with intentional discrimination based on any number of other

characteristics, it surely violates the Equal Protection Clause to use government authority arbitrarily to apply different legal rules--rules that can result in monetary penalties and, potentially, incarceration--to similarly situated citizens.  As a result, summary judgment will be denied on the Griders' equal-protection claim against Meeks.

### iii. Claims Against the City of Auburn

The Griders also bring claims under § 1983 against the city, asserting violations of their equal-protection and procedural-due-process rights and asking the court to declare several city enactments unconstitutional on equal-protection and substantive-due-process grounds.

The equal-protection claim is, essentially, an argument that the constitutional violations by city employees discussed above constituted a city policy of treating the Griders differently such that the city is liable for the underlying violations of its employees and

officials.  While the city cannot be held liable solely on a theory of respondeat superior for the constitutional torts of its employees, see Monell v. Department of Social Services, 436 U.S. 658, 691 (1978), liability may be imposed when federal rights are violated pursuant to official "policy or custom."  Id. at 694.  Official policy can be established through a single decision by a municipal policymaker.  See Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986).  Moreover, a municipal government can be held liable for inadequate training and supervision of employees who, as a result, violate constitutional rights, provided that the municipality's failures amounted to "deliberate indifference" to the rights of its citizens.  Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998); see also City of Canton v. Harris, 489 U.S. 378, 387 (1989).

The city first argues that the Griders did not adequately plead a policy or custom and did not identify a "final policy maker."  Defs.' Brief (Doc. 95) at 42.

53

However, the Griders clearly assert that the city's policy was to damage the Griders' business using a variety of consistent means, and they clearly allege that various city employees at the highest levels, particularly City Manager Duggan, Mayor Ham, and several other defendants, including those ultimately in charge of the city's safety codes, participated in decisions that violated their rights.[13]

The city next argues that it cannot be liable because no underlying constitutional violations occurred.  This argument fails given the above discussion of the Griders' constitutional claims.

---

13.  The City also emphasizes that the Griders have failed to identify "the final policy maker for the City." Defs.' Brief (Doc. 95) at 44.  This argument appears to assume that there can be only one final policymaker for the City.  This contention is incorrect, for there may be many policymakers in any municipal entity, each responsible for policy in different areas or on different issues.  Moreover, "there will be cases in which policymaking responsibility is shared among more than one official or body." City of St. Louis v. Praprotnik, 485 U.S. 112, 126 (1988) (plurality opinion).

More importantly, the city argues that there is insufficient evidence to show that high-level policy officials knew about the scheme or the constitutional violations of which it allegedly consisted.  The Griders have provided evidence of comments among the city's top leaders of a desire to put Skybar out of business so that a new development could take its place in the city's urban core, followed by constitutional violations consistent with this stated desire.  Indeed, the bribery charge occurred during an unprecedented video surveillance of the Skybar on a number of occasions, and the Griders and their employees were repeatedly and consistently cited for various violations of city ordinances (although apparently not a single citation has resulted in a conviction).

However, the Griders have put forward no evidence that high-ranking city policymakers were involved at all in the particular constitutional violations that they allegedly suffered.  For instance, there is simply not

enough evidence that Mayor Ham or City Manager Duggan connected their desire to remove the Skybar with unlawful activity such as encouraging officers to effectuate unlawful arrests or improperly calculating building-occupancy numbers.  The Griders have produced evidence of a vaguely stated desire that Skybar be moved or closed, attempts to use eminent domain, increased surveillance, and perhaps even efforts to pass legislation that would ultimately have an effect on Skybar's alcohol sales. However, none of that conduct is illegal, and no evidence links high-ranking officials, either in the executive positions, the Police Department, or the Public Safety Department, to the constitutional violations that the Griders may have suffered at the hands of lower-ranking employees.  Without any evidence that policymakers played some role in--or at least knew about--the conduct comprising the constitutional violations, it cannot fairly be stated that the violation of the Griders' constitutional rights was a result of city policy.

56

Moreover, the unlawful actions of the city's employees and officials did not rise above "random acts or isolated incidents" to constitute a "persistent and wide-spread practice." Depew v. City of St. Marys, 787 F.2d 1496, 1499 (11th Cir. 1986). Indeed, the two constitutional violations for which the Griders have provided evidence--the 2005 bribery charge and the improper occupancy calculations--share no evidentiary link other than the general theory that the entire city apparatus was out to get the Griders; these purported violations, emanating from different municipal departments, unconnected by any other evidence and involving dramatically different conduct, cannot rise to the level of a pattern such that it was the city's custom to violate the constitutional rights of the Griders. Thus, the Griders' claim that the city's policies and customs resulted in the unequal treatment of them in violation of the Equal Protection Clause must fail.

57

The Griders also assert that the city's policy of issuing "nonexistent" overcrowding citations violated their procedural-due-process rights.  According to the Griders, the criminal offense of "overcrowding," with which they and their employees were charged numerous times, did not exist at the time they were charged.  The city had adopted the International Fire Code and made a failure to comply with the code punishable under city law.  However, the fire code itself gives the Fire Inspector authority only to notify violators of the violation and to specify a time for reinspection.  If the violation is not remedied, the Fire Inspector can enlist help of legal counsel to take appropriate proceedings in law or equity to remedy the violation.  Thus, the Griders argue, no provision of the code allowed for criminal prosecution, and overcrowding itself was thus not a criminal offense, but rather a violation of the code which the city could force them to remedy through only civil proceedings.  To support this argument further, the

58

Griders point to a January 2008 ordinance which specifically defined penalties for overcrowding and, according to a memorandum from Public Safety Director James to City Manager Duggan, was proposed "to clarify who will be held responsible for overcrowding" and "to define the applicable penalties for this type of violation." Pls.' Ex. MM.

The city correctly notes, however, that the fire code as adopted explicitly makes it unlawful to operate a building in violation of any provision of the code, which includes operation of an overcrowded building. The city then argues that Fire Inspector Massey and other inspectors are given the authority by the code to institute appropriate action to correct violations. The problem with this argument, however, is that the code portion to which the city cites for that authority clearly contemplates only civil actions and requires a Fire Inspector to give violators notice so that they can

comply prior to reinspection.  Neither of these options was pursued by Massey or the city here.

Nonetheless, the city also points to § 5-156 of the Auburn City Code, which essentially provided that any person not in compliance with any portion of the adopted fire code shall be punished as provided in § 1-9 of the city code.  This language appears plainly to modify and augment the inspector's authority to issue notifications, require reinspection, and pursue civil sanctions as provided by the fire code itself; it also appears to render criminal any noncompliance with the fire code, even if the violator is not notified of the violation in advance and given a chance to remedy it.  Thus, the city, even prior to January 2008 (when it "clarified" the applicable penalties), appears to have supplemented the uniform fire code to make it a criminal municipal violation to, among other things, operate an overcrowded building.  Thus, the Griders' due-process claim based on the nonexistence of the offense fails.

60

Finally, the Griders seek a declaratory judgment, pursuant to 28 U.S.C. § 2201, that several Auburn City laws are unconstitutional. The challenged city enactments include a resolution passed in September 2001 and ordinances passed in November 2001, December 2007, and January 2008. The Griders attack each on the basis of equal protection and substantive due process.

As discussed earlier, to establish an equal-protection violation on a "class of one" theory, the Griders must demonstrate that they were intentionally treated differently from those who were similarly situated and that there was no rational basis for such difference. <u>See</u> <u>Campbell v. Rainbow City</u>, 434 F.3d 1306 (11th Cir. 2006).

The Griders claim that a September 2001 resolution extending the probationary period for their Blue Room business constituted an equal-protection violation. However, the Griders do not even argue that they were

treated differently from a similarly situated business.[14]
Regardless, the Griders were taken off of probation just
a month later.  Thus, a declaration of this resolution as
unconstitutional is a moot issue, even were it not for
the clear failure of the Griders to state a viable claim
against it.

The Griders next challenge the November 2001,
December 2007, and January 2008 ordinances that
essentially modified the rules governing the sale of

---

14.  Indeed, the city points out that the resolution
simply extended the probationary period for the Blue Room
because the Griders were still in blatant violation of
the requirement that restaurant and lounge licenses
maintain a 60:40 food alcohol ratio.  (While the Griders
appear to argue that this 60:40 ratio--a product of an
earlier ordinance--was itself meant to target their
business, they do not present a challenge to that rule.)
The council expressed concern with the Griders' past
inability to comply with this rule and noted particular
skepticism at the Griders' stated desire to meet the
quota by charging for a buffet at the door but not
collecting receipts that would allow for any subsequent
auditing; indeed, around the same time, the council also
placed another similar business (Bodega), which was not
owned by the Griders, on probation for the same
violations.  Thus, the Griders have not shown that the
resolution targeted their business in a unique or
discriminatory way.

alcohol for certain classes of liquor licenses.   They argue that they were the only 'lounge' license operating in the City of Auburn at the time of the November 2001 ordinance and that the December 2007 and January 2008 ordinances targeted their businesses shortly after they obtained a 'tavern' license.   The Griders place these ordinances in the context of an overall pattern to change the liquor laws pertaining to a particular type of license shortly after the Griders had obtained that particular license.

Even if, however, the Griders were intentionally treated differently, they have not made any showing that this treatment lacked a rational basis.   Indeed, the facts relating to the 2001 ordinance are sparse almost to the point of nonexistence, and the court will not infer a constitutional violation merely from the alleged timing of an ordinance (five months after the Griders obtained a lounge license).   Moreover, the city clearly has an interest in regulating the sale of alcohol at large

establishments, and the Griders do not explain what about the ordinance is not rationally related to that legitimate interest. Similarly, the 2007 and 2008 ordinances applied to all Auburn businesses that served alcohol. The fact that these ordinances excluded private clubs that were already in operation is apparently a fact of great import for the Griders; they ignore, however, that, while such an exemption may work to the benefit of private clubs, it works to the potential detriment of all other businesses serving alcohol in the city, not just those owned by the Griders. Furthermore, the Griders do not respond to the city's arguments that the ordinances simply attempted to make the city's laws consistent with state law and that state law, like the new ordinances, allowed the sale of alcohol past 2:00 a.m. on Sundays at private clubs. In any case, the attempt to curb alcohol sales during the early hours of the morning is clearly a legitimate state interest, and the mere fact that a few

establishments denoted private clubs are exempt from this particular criterion does not render the law irrational.

The Griders' substantive-due-process challenge to the ordinances fails for similar reasons.  The Griders urge that the eight-year conspiracy against them, allegedly involving a wide variety of tactics, violates the constitution because it "shocks the conscience." County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998); Rochin v. California, 342 U.S. 165, 172-173 (1952).  However, the Griders make no specific arguments about how particular ordinances challenged in the complaint deprived them of any fundamental interests let alone any argument about why these attempts to regulate drinking establishments would shock the conscience.

Summary judgment will be entered against the Griders on their equal-protection and due-process claims against the City of Auburn.

## 2. Conspiracy Claims

The defendants believe that the Griders' conspiracy claim against them fails for four reasons: First, the Griders did not properly plead the 'new' unified conspiracy theory that they now assert in their brief in opposition to summary judgment; second, the Griders do not allege an underlying violation of § 1983; third, the Griders do not sufficiently show an agreement between any two defendants; fourth, the 'intracorporate conspiracy' doctrine prevents employees of the city from conspiring with each other.

## a. "New" Theory of Conspiracy

The defendants claim that the Griders' brief in opposition to summary judgment now alleges two distinct conspiracies, including a "new conspiracy" between the city and two private developers. Defs.' Reply at 6-7. According to the defendants, the new allegations of a conspiracy involving the desire of private developers to

66

use the property leased by the Griders should be viewed as distinct from the previously asserted conspiracy among city employees to put the Griders out of business.

The defendants argue that the court should strike all references to this "new conspiracy" because it was not raised in the pleadings.  The defendants overlook, however, that these new facts highlighted by the Griders do not present a new conspiracy, but rather new evidence supporting the same conspiracy alleged in the complaint. This is a crucial distinction.  The new facts do not change the major players, the overt acts, the substantive constitutional violations (the touchstone of a § 1983 conspiracy claim), the injuries suffered, or the goals of the conspiracy.  At best, the new information helps paint a better picture of why the defendants may have engaged in the conspiracy to harm the Griders and reduce the value of their business; it sheds light on the defendants' potential motives.  Moreover, as the Griders noted, much of this information simply could not have

been pled because it was only learned during discovery. In many cases, particularly those involving potentially significant conspiracies with many defendants, plaintiffs will not be able to understand the full extent of the defendants' behavior until they are able to interview the defendants and other potential witnesses and engage in documentary discovery. It is indeed common that plaintiffs discover damaging evidence in discovery that helps paint a clearer picture of why they suffered the injuries over which they brought suit; this new evidence may very well help the Griders prove a conspiracy, but it would not be a new one.

### b. Underlying Constitutional Violations

In order to establish a conspiracy under § 1983, the Griders must demonstrate an underlying constitutional violation. As discussed in more detail above, the Griders, at least for the purposes of summary judgment, have properly done so.

68

There is a split of authority, however, concerning which underlying constitutional violations may be included in this conspiracy based on when the corresponding statute of limitations expired. For example, even though the statute has run with respect to the Griders' false-arrest claim against Carver, if such a claim were part of a conspiracy it is possible that the statute would run not when that act occurred but rather when the last overt act in the continuing conspiracy occurred. Most circuits have held that, in civil-conspiracy actions under § 1983, the statute of limitations runs separately for each individual overt act of the conspiracy. See, e.g., Gibson v. United States, 781 F.2d 1334 (9th Cir. 1986); Helton v. Clements, 832 F.2d 332 (5th Cir. 1987); Wells v. Rockefeller, 728 F.2d 209 (3rd Cir. 1984); Singleton v. City of New York, 632 F.2d 185 (2d Cir. 1980). The Eighth Circuit and the former Fifth Circuit have come to the opposite conclusion, finding that the statute begins to run upon

the completion of the last overt act linked to the conspiracy. See White v. Bloom, 621 F.2d 276 (8th Cir. 1980); Slavin v. Curry, 574 F.2d 1256 (5th Cir. 1978).[15] The Eighth and Fifth Circuit cases, however, relied on the relevant state-law rules governing accrual of a conspiracy claim, a practice the Supreme Court has since condemned.[16] Wallace v. Kato, 549 U.S. 384, 388 (2007). As a result, the court is not bound by the holding in Slavin to look to Alabama law, and it can consider the proper federal rule.

One fundamental purpose of statutes of limitations is to grant repose to defendants.  So long as defendants

---

15. In Bonner v. Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

16. It appears that many States, as evidenced by the Eighth and Fifth Circuit cases applying Missouri and Texas law respectively, employ a contrary  approach to the general rule of the federal courts cited above and hold instead that the statute of limitations does not run until the last overt act in civil conspiracy cases. See, e.g., Wyatt v. Union Mortgage Co., 598 P.2d 45, 53 (Cal. 1979).

remain actively engaged in a conspiracy to violate
constitutional rights by committing overt acts in
furtherance of that conspiracy, it may be reasonable to
argue that they are not entitled to rest easy knowing
that earlier acts that were a part of the same plan are
too temporally attenuated.  Nonetheless, even if a common
scheme connects actions, it can be unfair to expect
defendants to defend competently against acts that may
have caused harm long ago.  In addition, the fact of a
conspiracy should not necessarily benefit the plaintiff
by extending the time within which she can sue for
substantive constitutional violations that, in any case,
did not actually accrue until she became aware of them--
unless the conspiracy itself, for some reason, unfairly
inhibited the plaintiff's ability to determine if her
rights had been violated or effectively pursue a legal
remedy.  It may be, for instance, that certain claims do
not accrue until a conspiracy is uncovered; for
constitutional violations that require a certain intent,

71

for example, the claims may not accrue until the conspiracy is revealed and the motives of the actors determined.

In the criminal context, the general rule is that the statute does not begin to run until the last overt act. <u>United States v. Parker</u>, 586 F.2d 422, 430 (5th Cir. 1978); <u>United States v. Mann</u>, 161 F.3d 840, 856-57 (5th Cir. 1998). This rule, on its face, differs from the civil rule developed by many of the federal courts cited above (but is consistent with the approach taken by many states in civil cases). The distinction makes sense though because, in § 1983 conspiracies, the <u>wrongful overt act</u>--and not the agreement itself--is the basis for recovery. <u>Singleton</u>, 632 F.2d at 192. In the criminal context, the very <u>agreement</u> itself is punished--an agreement that clearly extends until the final overt act.

The criminal rule is likely referring, therefore, only to the statute of limitations for the <u>agreement</u> itself. Each substantive offense comprising the criminal

conspiracy would still be governed by its own limitations
period.   Otherwise, an extension of the statute of
limitations to the last overt act of a conspiracy could
allow for punishment not only of the <u>illegal agreement</u>,
but also an extension of the time period for punishment
of all of the substantive offenses that constituted the
conspiracy, no matter when they were committed or which
co-conspirator committed them.   If this were the rule,
the inconsistent treatment of conspiracies between the
criminal and civil rights contexts would be difficult to
justify.[17]   While it is beyond the scope of this opinion
to determine and refine the proper rule in the criminal
context, the rules in the civil and criminal fora should
be logically consistent.   Predicating the statute of
limitations on each unlawful overt act is a reasonable

_____

   17.   Another way to achieve consistency would be to
separately punish the unlawful agreement in the civil
context.   After all, civil rights are placed in greater
danger when people agree to come together to violate
them.   This approach, however, would conflict with
current case law and ignore the general proposition that
civil claims compensate for actual damages.

and consistent approach whenever those acts are
<u>individually a basis</u> for any kind of liability, and the
court therefore agrees with the other federal circuits to
have addressed the rule in the context of § 1983 actions.

Thus, the Griders' conspiracy claim includes only
those substantive violations discussed earlier, and it
does not extend to any other constitutional violations
that would themselves be barred by relevant statutes of
limitations.

### c. Evidence of a Conspiracy

Conspiracy liability can be imposed based purely on
circumstantial evidence indicating an understanding among
defendants to violate constitutional rights. <u>Burrell v.
Board of Trustees of Ga. Military College</u>, 970 F.2d 785,
788-89 (11th Cir. 1992); <u>Bendiburg v. Dempsey</u>, 909 F.2d
463, 469 (11th Cir. 1990).  Thus, to the extent the
direct or circumstantial evidence sufficiently links a
defendant to an agreement to engage in the 2005 bribery

charge or the improper occupancy calculations, that defendant can be held liable for the substantive actions of co-conspirators.

However, as discussed earlier, the evidence is simply insufficient to link many of the named defendants to a scheme to violate the Griders' constitutional rights by prosecuting the 2005 bribery charge or by improperly calculating building-occupancy codes. There is no evidence that many of the defendants knew about the violations or were in a position, given the context of the decisionmaking process, such that they must have known about them. Thus, Mayor Ham, City Manager Duggan, and Public Safety Director James cannot be liable for the unlawful agreement alleged by the Griders. Moreover, the evidence is simply insufficient to link Fire Inspector Massey, who performed the occupancy checks, to Deputy Public Safety Director Meeks, who allegedly calculated the occupancy numbers improperly. Massey, then, cannot be liable for conspiracy. Finally, the evidence is

insufficient for a factfinder to conclude that Meeks conspired with any other person to calculate improperly the occupancy numbers for Skybar.

It is clear, however, that conspiracy liability may be imposed on the police officers that participated in the events surrounding the 2005 bribery charge. Sufficient evidence exists to implicate Officers Neal, Crook, and Carver, each of whom allegedly participated in the events giving rise to the constitutional violations. Likewise, sufficient evidence implicates Officer Maddox, who supervised the surveillance operations, including the surveillance operation that occurred the night of the alleged bribery.

### d.  Intracorporate Conspiracy Doctrine

Finally, the defendants urge the application of the 'intracorporate conspiracy doctrine.'  The basic tenets of this poorly understood doctrine are that a legal entity and its agents cannot conspire with each other and

that, likewise, the agents of a given legal entity cannot conspire among themselves.  McAndrew v. Lockheed Martin Corp., 206 F.3d 1031, 1036 (11th Cir. 2000) (en banc). The foundation of this doctrine is the general view that a person cannot conspire with herself.  Because corporations are often treated as fictional people and because the acts of corporate agents are imputed to the corporation, the doctrine posits that there may be instances in which it simply would not make sense to impose liability for conspiracy on ostensibly separate actors who are all actually representative of the same legal entity.  Dussouy v. Gulf Coast Inv. Corp., 660 F.2d 594, 603 (5th Cir. Nov. 1981) (explaining that because agency principles attribute the actions of agents to the corporation, the entities are a single legal actor, "negating the multiplicity of actors necessary to conspiracy").

This simple proposition was first advanced in the very limited context of antitrust law and, even more

specifically, in decisions concerning the provisions of the antitrust laws prohibiting collusion.  Some courts found that a corporation could not violate that provision of the Sherman Act by, essentially, colluding with itself and its agents.  Nelson Radio & Supply Co. v. Motorola, Inc., 200 F.2d 911 (5th Cir. 1952).  A key motivation for that holding was that, without the doctrine, other provisions of the act regarding monopoly would have been superfluous.  See Dussouy, 660 F.2d at 603.  Moreover, the original application of the doctrine highlighted that certain actions that were completely legal (and perhaps beneficial) when performed by one corporate entity were problematic when agreed upon by two (such as fixing a price).

Over time, courts began to expand the application of the theory beyond the antitrust context, although there is still a great deal of disagreement among the circuits about the contours of this expansion, particularly into the civil rights context.  See generally Brever v.

<u>Rockwell Int'l Corp.</u>, 40 F.3d 1119, 1126-27 (10th Cir. 1994); <u>Stathos v. Bowden</u>, 728 F.2d 15, 20-21 (1st Cir. 1984); <u>Novotny v. Great American Federal Savings & Loan Ass'n</u>, 584 F.2d 1235 (3rd Cir. 1978) (<u>en banc</u>).

In fact, courts have been sensitive to a myriad of potential problems with applying the doctrine too freely. Some courts, as a result, are hesitant to apply the doctrine at all in certain circumstances (like civil-rights actions), and others have carved out significant exceptions. After all, "the original purpose of the corporate entity fiction was to <u>expand</u> rather than shrink corporate responsibility." <u>McAndrew v. Lockheed Martin Corp.</u>, 206 F.3d 1031, 1039 (11th Cir. 2000) (<u>en banc</u>). Indeed, one ostensible purpose of the fiction was to enable corporations to act through their agents, allowing them to pool resources for the public benefit. Another benefit was to "require a corporation to bear the costs of its business enterprise," particularly the tortious acts of its employees. <u>Dussouy v. Gulf Coast Inv. Corp.</u>,

79

660 F.2d 594, 603 (5th Cir. 1981).  As the Fifth Circuit noted, the intracorporate conspiracy doctrine serves neither of these goals.  Id.  Moreover, when individuals working at the same formal legal entity conspire to violate the law, it often raises the same "group danger" thought to underlie conspiracy liability in the criminal context.

Furthermore, while the doctrine has been applied to public, governmental entities that are considered legal entities, see, e.g., Chambliss v. Foote, 562 F.2d 1015 (5th Cir. 1977) (applying doctrine to a public university), the rationale for applying the doctrine to municipalities is far weaker.  Indeed, there is no vicarious liability for municipal corporations.  See Monell v. Department of Social Services, 436 U.S. 658, 691 (1978).  Thus, these public "corporations," unlike the corporate entities for which the doctrine was originally designed and unlike other government entities to which it has been extended, simply cannot be liable

for the tortious acts of their employees solely on a theory of respondeat superior.

Under the peculiarities of § 1983, when municipal employees are sued in their individual capacities, they are separate individual entities, but when officers are sued in their official capacity, on the other hand, the suit essentially lies against the municipality itself. Busby v. City of Orlando, 931 F.2d 764, 776 (11th Cir. 1991). Thus, because the actions of agents are not imputed to the municipality, it is bizarre to view the wide-ranging agreement among various individuals to perform their respective jobs as one involving an entity conspiring with itself. When the acts of employees are not attributed to a municipal corporation and when a municipal corporation and its agents are not viewed as a single legal actor, it is difficult to see how "the multiplicity of actors necessary to conspiracy is negated." Dickerson v. Alachua County Comm'n, 200 F.3d

761, 767 (11th Cir. 2000) (quoting <u>Dussouy</u>, 660 F.2d at 603 (internal quotations removed)).

In addition to these conceptual problems (the unique aspects of the antitrust context and the policy problems associated with expanding the intracorporate conspiracy doctrine in ways that simply do not cohere with its fundamental assumptions), courts have found other reasons to be wary of the doctrine.  For example, the intracorporate conspiracy doctrine is ignored when the underlying conduct that forms the basis of the conspiracy could be criminal in nature.  <u>See</u> <u>McAndrew</u>, 206 F.3d at 1039-40; <u>United States v. Hartley</u>, 678 F.2d 961 (11th Cir. 1982).  The Eleventh Circuit, thus, does not apply the corporate 'fiction' when civil cases involve conduct that could also have been criminal.  <u>See</u> <u>McAndrew</u>, 206 F.3d at 1040 (holding that there is no need for a distinction between the criminal and civil contexts when the underlying conduct is criminal).

If the fiction is left "without a purpose" when
criminal laws are potentially violated, McAndrew, 206
F.3d at 1041 (quoting Dussouy, 660 F.2d at 603), it is
hard to see what that purpose might be when the laws in
question are civil-rights laws.  Indeed, if one cannot
logically conspire with oneself, why allow an entity to
conspire with itself for the purpose of criminal
liability?  The real crux of the matter is that, in many
instances, this fiction is indeed simply a fiction; it is
divorced from reality.  When individuals conspire to
violate laws, each acts as a separate individual, and
they pose increased dangers by their association, even if
they all work for the same legal entity.  Similarly, in
the civil context, when employees come together to act in
a variety of ways, over an extended period, and engage in
a variety of separate actions, it is ever more difficult
to categorize this conduct as anything but a conspiracy.
Indeed, this kind of activity is very different from a
single decision made by an entity, such as a choice made

by a small group of executives to fire an employee for unlawful reasons.

Courts have increasingly recognized these problems and have started to carve significant exceptions out of the doctrine. For example, courts have found exceptions when corporate agents "act outside the scope of their employment, have an independent personal stake in the corporate action, or engage in a series of discriminatory acts as opposed to a single action." Dickerson, 200 F.3d at 770. However, the Eleventh Circuit in Dickerson did not reach any of these potential exceptions because they were unsupported by the facts of that case.

Although a complete inquiry into potential exceptions to the doctrine is likewise unnecessary here, the exception concerning a series of unlawful actions makes a great deal of sense under the facts alleged in this case. As Dickerson explained, the First Circuit in Stathos v. Bowden, 728 F.2d 15 (1st Cir. 1984), faced a situation in which the constitutional violations were the

**84**

product of a "series of acts over time going well beyond simple ratification of a managerial decision by directors." Dickerson, 200 F.3d at 769 n.9 (citing Stathos, 728 F.2d at 21). Moreover, the conspiracy consisted of "joint discretionary activity--with many words and deeds--engaged in by each of the [participants]." Id. Similarly, here, the conspiracy asserted by the Griders against the police officers was not a single corporate decision or policy but, rather, involved a widespread plot among multiple city employees. This scheme included the repeated incidents of surveillance, both visual and video, repeated execution of Incident/Offense Reports over a lengthy period of time, investigations into liquor-law violations involving attempts to coerce patrons to implicate the Griders in liquor-law violations, and threatening verbal communications. All of the officers' combined actions--culminating in the unlawful bribery charge-- toward, perhaps, a common goal and involving the separate

exercise of their discretionary authority, cannot fairly be attributed to the city such that the meeting of the minds crucial to conspiracy liability is absent.

The nature of a corporation is typically such that each action necessarily involves at least one or more individuals making a decision that then binds the corporation.   It would be curious to hold that a conspiracy is formed for each and every corporate act that involved some internal deliberation, at least when the corporate entity is itself liable for the decision. Dombrowski v. Dowling, 459 F.2d 190, 196 (7th Cir. 1972) ("If the challenged conduct is essentially a single act of discrimination by a single business entity, the fact that two or more agents participated in the decision or in the act itself will normally not constitute [a] conspiracy.").   However, when individual members of a legal entity themselves have the requisite mental state to commit, in concert, unlawful conduct and engage in a series of separate and distinct actions in support of

that unlawful conduct over an extended period of time, even courts prepared to accept the intracorporate conspiracy fiction in some circumstances should ignore it.

If certain municipal employees are to be held liable for the full extent of the injuries caused by agreements they make to violate constitutional rights, conspiracy liability is crucial.  It is clear, then, that in such a case, the intracorporate conspiracy doctrine makes very little sense.  For example, even though the law allows the Griders to sue all of the officers who performed discretionary functions that violated their constitutional rights in their individual capacities, the defendants urge an extension of the intracorporate conspiracy doctrine that would prevent plaintiffs from showing that all of those actors acted in congress, thus removing the ability to make each of them liable for the actions of others.  The defendants advocate this approach even though each employee of a municipality would be

**87**

personally liable for her own torts and even though all of the employees had allegedly willfully joined in the agreement to each do her part to contribute to an overall series of violations and a shared goal.  Cf. Nesmith v. Alford, 318 F.2d 110, 126 (5th Cir. 1963) ("[F]or a claim under § 1983, a conspiracy as such is not an indispensable element as it is under § 1985. But it may be charged as the legal mechanism through which to impose liability on each and all of the Defendants without regard to the person doing the particular act.").  The court cannot accept such an interpretation of the doctrine, and it refuses to apply the doctrine to this set of facts.

For the reasons stated above, summary judgment will be entered against the Griders on their conspiracy claim against all defendants with respect to the improper occupancy calculations; and summary judgment will be denied with respect to Officers Carver, Crook, Maddox, and Neal for the conspiracy claim based on the 2005

**88**

bribery charge but will be entered against the Griders on that claim for all other defendants.

### B. State-Law Claims

### 1. Negligent Training, Hiring, and Supervision Claim Against Ham and Duggan

The Griders also bring a litany of state-law claims. The Griders first allege a claim of negligent training, hiring, and supervision against Mayor Ham and City Manager Duggan.[18]

The claims against Ham and Duggan fail. The Griders do not cite to a single Alabama case in support of their

---

18.   The Griders also brought this claim against the city.   In their response to the motion for summary judgment, however, the Griders argue only that Ham and Duggan are liable for such a claim, and they make no argument concerning why or how the city should be liable for this claim.   As a result, any claim against the city is deemed waived.   See infra note 2.

Likewise, summary judgment will be granted with respect to any other claims based on state law that were not raised and argued in the Griders' response to the defendants' motion for summary judgment--for example, the claims for abuse of process against Officer Carver and Fire Inspector Massey.   See id.

claim, nor do they even attempt to outline the potential
elements of the claim.  This total failure is perhaps not
surprising because other courts have suggested that a
claim against supervisors for negligent training, hiring,
and supervision does not exist under Alabama law.  <u>E.g.</u>,
<u>Ott v. City of Mobile</u>, 169 F. Supp. 2d 1301, 1315 (S.D.
Ala. 2001) (Butler, J.).  Without so much as an argument
rooted in Alabama law establishing the claim or defining
its contours, the Griders cannot survive summary
judgment.

### 2.  Malicious-Prosecution Claim Against Carver and Massey and False-Arrest Claim Against Massey

The Griders also bring claims of malicious
prosecution against Officer Carver and Fire Inspector
Massey and false arrest against Massey.  Because the
federal claims of malicious prosecution required the
Griders to prove the elements of such a claim under
Alabama law, the Griders have established those elements
with respect to Carver's 2005 bribery charge but not with

respect to Massey's October 2006 citation. Moreover, the
Griders cannot maintain a state-law claim of malicious
prosecution based on the November 2005 citations, which
were nolle prosequied in January 2006. Alabama courts
allow claims for malicious prosecution when a citation is
issued that forces a defendant to appear in court to
defend against a criminal charge, even if no formal
arrest was made. Sears, Roebuck & Co. v. Alexander, 252
Ala. 122, 124-25 (Ala. 1949). However, as noted earlier,
the Griders have simply not put forward any competent
evidence that Massey lacked probable cause in issuing the
citations. In fact, Patrick Grider admitted in his
deposition that he "had no idea" if Skybar was over its
occupancy numbers at the time of the November 18 and 19
citations. Defs.' Reply (Doc. 116) at 25-26.

The existence of discretionary-function immunity
under state law does not protect Officer Carver. Carver
is not entitled to discretionary-function immunity if he
lacked arguable probable cause to arrest Patrick Grider.

91

See <u>Borders v. City of Huntsville</u>, 875 So.2d 1168, 1180 (Ala. 2003).  Reading the facts in the light most favorable to Grider, he never offered any money to Carver nor suggested anything improper to him.  Carver's bribery allegations are wholly denied by Grider, and, particularly when combined with the circumstantial evidence surrounding this incident as discussed earlier, a jury could determine that there was no arguable probable cause to arrest Grider for any offense.

The Griders also argue that Massey's October 2006 citation of Grider was a false arrest.  As noted earlier, however, a mere citation is typically not viewed as an arrest, and the Griders have pointed to no Alabama authority that indicates that the Alabama rule is any different.[19]  In any case, the Griders have merely shown that Massey was doing his job as an inspector, enforcing

---

19.  <u>Alexander</u> (and cases following it) establishes that the tort of <u>malicious prosecution</u> can be based on a summons or citation, but it is silent on whether such a requirement to appear at a later date could be the basis of a false-arrest claim.

the occupancy numbers that had (even if improperly) been calculated by someone else.  As a result of Massey's job duties, he was required to issue citations when the Griders exceeded their maximum occupancy numbers, and the Griders have not provided any evidence that they did not exceed those numbers on the occasion of October 14, 2006.

For these reasons, summary judgment will be denied with respect to Patrick Grider's state-law malicious-prosecution claim against Carver and granted with respect to Grider's state-law malicious-prosecution and false-arrest claims against Massey.


### 3. Intentional-Interference-with-Business or Contractual-Relations Claims Against All Defendants

The Griders next bring a claim for intentional interference with business or contractual relations against all named defendants.  To prove such a claim, the Griders must show "(1) the existence of a contract or business relation; (2) the defendant's knowledge of the contract or business relation; (3) intentional

93

interference by the defendant with the contract or business relation; and (4) damage to the plaintiff as a result of the defendant's interference." Joe Cooper & Associates, Inc. v. Central Life Assurance Co., 614 So.2d 982, 986 (Ala. 1992). The Griders must also show some fraud, force, or coercion, which they have done with respect to the 2005 bribery charge and the improper occupancy calculations. Id. The defendants argue that they cannot be liable for this tort because they were acting pursuant to their government job duties and that any alleged interference was the byproduct of their lawful performance of their job duties. Thus, the defendants do not dispute any of the elements of the tort, but argue instead, as an affirmative defense, that any interference was justified. See Utah Foam Products, Inc. v. Polytec, Inc., 584 So.2d 1345, 1353 (Ala. 1991). As discussed earlier, however, there are genuine issues concerning whether the actions of several of the defendants constituted violations of state and federal

**94**

law; those issues prevent the court from concluding that the interference was justified as the byproduct of lawful job performance.   Summary judgment will therefore be denied on this claim with respect to Deputy Public Safety Director Meeks and Officers Carver, Crook, Maddox, and Neal and entered against the Griders with respect to the remaining defendants.

### 4. Fraud Claims Against James and Meeks

Finally, the Griders assert several species of fraud claims.   The Griders make claims of fraudulent misrepresentation, fraudulent suppression, and fraudulent deceit against Public Safety Director James and Deputy Public Safety Director Meeks.   The claims against James stem from occupancy numbers he assigned in 2001 and 2003. The claims against Meeks stem from a series of calculations he made, beginning in 2005.

The parties agree that the statute of limitations on fraud claims is two years, and James therefore urges the

court to grant summary judgment on the claims against him. The statute of limitations begins to run when a plaintiff actually discovers or reasonably should have discovered the fraud. Foremost Ins. Co. v. Parham, 693 So. 2d 409, 417-421 (Ala. 1997).

The Griders argue that, due to the nature of the fraud, they could not have discovered James's fraud until 2006, when subsequent changes they made to the building resulted only in minimal changes to their occupancy numbers, an occurrence which first led them to familiarize themselves with building codes. However, the evidence does not support this contention. The Griders knew of the occupancy calculations as soon as James made them, and the procedures for making the calculations were publicly available in the relevant codes. That the Griders simply decided not to question the numbers that they now allege were the lifeblood of their business is not due to any affirmative act of concealment by James but is, instead, due to the Griders' own decision not to

96

scrutinize the calculations.  This is particularly true because the Griders allege that the calculations are blatantly inconsistent with the relevant codes; indeed, the Griders use words like "arbitrary" and "ludicrous" to describe James's calculations.  The Griders received the occupancy calculations and had access to the relevant rules for making such calculations; indeed, estimates of such calculations are vital to operating a business that depends on the number of customers for viability.  It is impossible to conclude, therefore, that the Griders did not have all of the facts that could reasonably have alerted them to the fraud.  The Griders have described the series of events that led them to discover the fraud, but they have not offered any explanation as to why the improper calculations should not reasonably have been discovered several years earlier, shortly after they were made and provided to the Griders.

There is no contention, however, that the series of calculations made and changes required by Meeks in 2005

and 2006 are similarly barred by the statute of limitations. Therefore, the only issue on these claims is whether the Griders have created a genuine issue of material fact on the elements. A claim of misrepresentation requires (1) a misrepresentation of material fact, (2) made willfully to deceive, recklessly, without knowledge, or mistakenly, (3) which was justifiably relied on by the plaintiff under the circumstances and (4) which caused damage as a proximate consequence. Ex parte DaimlerChrysler Corp., 952 So.2d 1082, 1090 (Ala. 2006). As noted earlier, the Griders have alleged conduct by Meeks that sufficiently states a claim for misrepresentation. Without recapitulating the prior discussion, the Griders created a genuine dispute as to whether Meeks arbitrarily and intentionally miscalculated the occupancy numbers for Skybar and improperly required certain modifications. They relied on these requirements due to Meeks's position as a city-code-enforcement-employee at substantial cost.

A claim for deceit requires similar elements except that, pursuant to 1975 Ala. Code § 6-5-103 and § 6-5-104, deceit also requires that the misrepresentation be willful or reckless and made with the intent to deceive. Montgomery Rubber & Gasket Co. v. Belmont Mach. Co., 308 F. Supp. 2d 1293, 1299 (M.D. Ala. 2004) (Thompson, J.); Whitlow v. Bruno's, Inc., 567 So.2d 1235, 1240-41 (Ala. 1990).  The Griders note that, under § 6-5-104, deceit is defined as: "(1) The suggestion as a fact of that which is not true by one who does not believe it to be true; (2) The assertion as a fact of that which is not true by one who has no reasonable ground for believing it to be true; (3) The suppression of a fact by one who is bound to disclose it or who gives information of other facts which are likely to mislead for want of communication of that fact; or (4) A promise made without any intention of performing it."  The Griders sufficiently allege this claim because there is substantial evidence that Meeks knew he was issuing improper occupancy calculations but

nonetheless communicated the improper calculations to the Griders.

Finally, the Griders' fraudulent suppression claim requires "(1) the suppression of a material fact (2) that the defendant has a duty to communicate (3) because of a confidential relationship between the parties or because of the circumstances of the case and (4) injury resulting as a proximate consequence of the suppression." <u>Ex parte Dial Kennels, Inc.</u>, 771 So.2d 419, 421 (Ala. 1999).  The Griders have provided evidence that Meeks suppressed the true occupancy calculations, which clearly induced the Griders to rely on the improper calculation by limiting their establishment to certain capacities each night.  As a city codes inspector, Meeks owed a duty to the businesses that he examined to communicate a truthful and accurate code calculation.

For each of these claims, the Griders have produced evidence that Meeks acted "willfully, maliciously, fraudulently, in bad faith, beyond [his] authority, or

under a mistaken interpretation of the law." <u>Ex Parte</u> <u>Cranman</u>, 792 So.2d 392, 405 (Ala. 2000).  As a result, he is not entitled to discretionary-function immunity.

Thus, summary judgment will be denied with respect to the claims against Meeks for misrepresentation, deceit, and fraudulent suppression but granted with respect to each of the fraud claims against James.

\*    \*    \*

For the above reasons, it is ORDERED that:

(1) Defendants City of Auburn, William Ham, Jr., Charles M. Duggan, Jr., William James, Andrew Meeks, Thomas Massey, James Terry Neal III, Jason Crook, Christopher Carver, and Slone Maddox's motion for summary judgment (doc. no. 94) is denied as to the following claims brought by plaintiffs Patrick James Grider, Daniel Joseph Grider, and The Fourth Quarter:

(a) 18 U.S.C. § 1983 malicious-prosecution claim against defendant Carver;

101

(b) Section 1983 equal-protection claim against defendant Meeks;

(c) Section 1983 conspiracy claim against defendants Carver, Crook, Maddox, and Neal;

(d) State-law malicious-prosecution claim against defendant Carver;

(e) State-law intentional-interference-with-business or contractual-relations claim against defendants Carver, Crook, Maddox, Neal, and Meeks; and

(f) State-law fraud claims against defendant Meeks.

(2) The motion is granted in all other respects, with the result that summary judgment is entered in favor of defendants City of Auburn, Ham, Duggan, James, Meeks, Massey, Neal, Crook, Carver, and Maddox and against the Grider plaintiffs and plaintiff The Fourth Quarter on all remaining claims, with the Grider plaintiffs and plaintiff The Fourth Quarter taking nothing by these claims.

**102**

(3) Defendants City of Auburn, Ham, Massey, James, and Duggan are no longer parties for purposes of trial.

DONE, this the 18th of June, 2009.

___/s/ Myron H. Thompson___
UNITED STATES DISTRICT JUDGE